## Mary A. Wilkinson et al., Appellants, v. G. C. Heberling et al., Appellees.

### Gen. No. 7,585.

1. EQUITY—*avoidance of multiplicity of suits as sole ground of jurisdiction.* A court of equity has jurisdiction, on the sole ground of avoidance of multiplicity of suits even though no other equity is involved, to entertain a bill by numerous stockholders holding different amounts of capital stock purchased at different times and for different amounts, against a corporation and various officers, directors and representatives thereof as defendants, for the rescission and cancellation of the various stock subscriptions of the several complainants and the return to them of the purchase price thereof, where the bill alleges that the complainants were induced to purchase the stock as the result of conspiracy and fraud of the defendants, participated in by them at different times during the life of the conspiracy and consisting of separate and distinct acts of the several conspirators, different charges being made against the individual defendants, all acts charged being pursuant to and part of the same general conspiracy.

2. EQUITY—*when bill presenting common point of litigation not multifarious.* A bill by numerous stockholders of a corporation against the corporation and its officers, directors and representatives during a period of several years, for the rescission and cancellation of the complainants' several subscriptions to the capital stock and to recover the purchase price of stock, is not rendered multifarious by the fact that the various individuals were active as officers or directors at different times during the period in question and that several causes of action are alleged against them separately, where the bill is predicated on conspiracy and fraud in which all defendants participated and the bill is entertainable by equity under its jurisdiction to avoid a multiplicity of suits, and a common point of litigation is presented, involving the whole subject-matter, the decision of which will settle the rights of all parties to the suit.

3. EQUITY—*joinder of all conspirators as misjoinder.* A bill by numerous stockholders of a corporation, against the corporation and its officers, directors and representatives during a stated period of time, for the rescission and cancellation of the complainants' subscriptions for stock and the recovery of their money, predicated on conspiracy and fraud in which all defendants participated, is not objectionable on demurrer for misjoinder, notwithstanding the stockholders subscribed at different times and on different

terms, and the personnel of the conspiracy changed from time to time.

4. EQUITY—*retention of jurisdiction for all purposes.* Jurisdiction of a bill for the rescission and cancellation of subscriptions to corporate stock will be retained in equity, regardless of the sufficiency of the allegations to show an adequate remedy at law, where the bill states a ground for equity to avoid multiplicity of suits, the complainants are numerous and their individual interests small and the remission to their legal remedy against defendants would amount to a denial of any remedy.

Appeal by plaintiffs from the Circuit Court of McLean county; the Hon. E. F. BARRY, Judge, presiding. Heard in this court at the April term, 1923. Reversed and remanded with directions. Opinion filed October 26, 1923.

TUESBERG, WILSON & ARMSTRONG, for appellants.

LIVINGSTON & WHITMORE, C. B. HUGHES, BRACKEN & YOUNG and MORRISSEY, SULLIVAN & RUST, for appellees; SIGMUND LIVINGSTON, JOHN J. MORRISSEY and W. W. WHITMORE, of counsel.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

This is a bill in chancery brought by appellants, Mary A. Wilkinson and 126 others, purchasers of stock of the Illinois Tractor Company, holding an aggregate of 1,884½ shares of stock, the individual holdings ranging in number from one to 115 shares, purchased at varying dates between November 24, 1917, and February, 1921, at amounts ranging from $100 to $150 per share. The purpose of the bill is to *rescind and have canceled the stock purchases* made by the complainants and to recover from the defendants, said corporation, the Illinois Tractor Company, and the other defendants, who were and had been officers and directors of said corporation, the full amount paid by each of the appellants (complainants) upon such purchases of stock, with interest, less any dividends which may have been received by them. An amended bill

was filed, to which the defendants interposed demur-
rers, which were sustained by the court below, and the
appellants electing to stand by their bill, the same was
dismissed for want of equity, and appellants have
brought the case to this court, by appeal, to reverse
the decree.

The allegations in the amended bill of complaint
show substantially the following state of facts:

The Illinois Tractor Company, an Illinois corpora-
tion with its principal place of business at Blooming-
ton, was incorporated February 15, 1912, by appellees,
Will, Heberling, Beich, Garber and Leary, under the
name of Illinois Silo Company, with an authorized
capital of $100,000. About November 24, 1917, its
name was changed to Illinois Silo & Tractor Company
and the capital increased to $500,000, and about Feb-
ruary 15, 1919, the name was again changed to the
Illinois Tractor Company and the capital further in-
creased to $2,500,000. It is alleged in the bill that ap-
pellees Will, Beich and Heberling were directors dur-
ing all of the time covered by the said sales of stock;
appellee Garber, also, except from November 7, 1916,
to November 6, 1917; appellee Leary, also, until April
15, 1919, and appellees Wilton & Sweeny, also, until
November 6, 1917; that appellee Schrieder was a di-
rector from November 7, 1916, to November 6, 1917,
and from April 15, 1919, until the end of the period;
appellee Mecherle was a director from November 6,
1917, until the end of the period; appellee Carr was
a director from November 6, 1917, to April 15, 1919;
appellee Sprankle served as director from June 7,
1918, and appellees Dye and Mann from April 15, 1919,
to the end of the period. The appellee Will during the
entire period was also a member of the executive com-
mittee and attorney for the company and was presi-
dent until December 1, 1917, and treasurer from No-
vember 6, 1917, until December 1, 1917; appellee Heb-
erling was treasurer from December 1, 1917, to June
14, 1918, and president from February 1, 1918, until

the end of the period. Appellee Garber was variously vice president, secretary, treasurer and member of the executive committee. Sprankle was general manager and treasurer from June 14, 1918, until the end of the period.

The bill further avers that the business of said corporation was, from its inception, conducted at a loss. By the close of the fiscal year ending September 30, 1916, its original capital of $100,000 had been impaired by losses aggregating $44,000, and by the end of the year 1918 it had lost the additional sum of $125,000, thereby incurring a deficit of $170,000. For the year 1919 it suffered additional losses of $250,000, increasing the deficit to $420,000, and by the end of the year 1920 it had incurred additional losses of $265,000, and in addition there were then included among its assets uncollectible notes receivable in the sum of $150,000, whereby the actual deficit was on December 31, 1920, in excess of $800,000; that about August 1, 1916, the then officers and directors of said company entered into conspiracy to sell the stock of said corporation by means of the false and fraudulent representations hereafter set forth. This conspiracy continued until January 1, 1921, and the officers and directors elected after August 1, 1916, joined therein on or about the dates they were elected. All of the defendant directors were moved to join this conspiracy for the purpose, first, of preserving their respective investments in the stock of said corporation; second, of participating in the profits and commissions arising from the sale of stock; and third, of paying to themselves illegal dividends out of the corporation's capital; that about August 11, 1916, in pursuance of said conspiracy, the then officers and directors induced the stockholders to increase the capital stock from $100,-000 to $500,000, although said increase was not consummated until November 24, 1917, and to promote the sale of said new stock the said directors on June 29, 1917, voted the payment of a dividend of one per cent,

payable September 1, 1917, and every two months thereafter, and dividends were accordingly paid out of capital to and including May 1, 1918.

The bill further alleges that on March 13, 1918, the then directors voted to pay dividends of eight per cent per annum, payable quarterly, and paid the same out of stock sales to January 1, 1920; that in 1917, a fictitious item of $96,000 was added to the surplus for patents and that about December 30, 1917, a lease of some clay lands was acquired for $2,000, the clay taken to be paid for in royalties, and this item was capitalized in the sum of $125,000; that on July 23, 1918, said appellees, as officers and directors of said company, entered into a contract with one Sutton, whereby said company acquired, for a term of years, rental rights to the use of a plat of ground located near the Minonk Coal Company's mine in Woodford county, with the right to use clay and shale for a nominal consideration, as set out, which the appellees fraudulently caused to be appraised at the sum of $200,000, and, of that, the sum of $175,000 carried to the pretended assets of said company. Large items of expense, aggregating $45,000, were carried to pretended assets to the amount of $30,000. In 1919, the properties were, without any foundation, marked up in price $7,500, $8,800 and $12,962.47, respectively, and the additions charged to assets. In March, 1919, appellee Garber was paid $38,000 for himself and stock salesmen for the sale of stock. In 1919, false balance sheets were made and the Securities Law, [Cahill's Ill. St. ch. 32, ¶ 254, *et seq.*] passed that year, was violated by the pretended and fictitious transfer of a large block of stock made after July 1, but purporting to have been made prior to the passage of the law, in the form of an option to appellee Sprankle, and such stock was pretended to have been issued to appellee Sprankle. In December, 1917, said appellees, then in office, made and pretended to make sale of large blocks of stocks to appellee Garber, which, by plans worked out by said

appellees, then in office, were sold, a part for $125 per share and a part for $150 per share, and portions of said sales split and divided up between said appellees, according to an agreed plan, said sales being made upon false representations, consisting of false, fictitious and fraudulent audits, financial statements and representations in writing and oral that said company had a large surplus, was in sound financial condition and during all of said period was capable of and did pay large dividends out of net earnings; that said officers and directors used these fraudulent financial statements to procure letters, addressed to the public from various banks, individuals, business concerns, associations and the officers thereof, asserting that said company was on a sound financial basis and making profits out of its business, and thereby said appellees secured favorable ratings with commercial agencies, and appellees caused to be prepared printed prospectuses and circulars containing the same false representations and caused copies of these financial statements and letters to be printed and circulated among prospective buyers of stock, including complainants, for the purpose of inducing them to buy stock, said letters, circulars and prospectuses containing the said false representations as set out.

Other specific acts of fraud and manipulation of the properties of said company are charged in the bill. It is charged that all of such statements, circulars, audits and representations were false and fraudulent; that such statements and representations were relied upon by the complainants and that the truth of said matters was not known to the complainants until shortly before the filing of this bill and after the said tractor company had become insolvent and its affairs were taken over by the bankruptcy court. It was further charged in the bill that all of these acts were performed by the appellees, acting in concert and in pursuance of the specific plan and conspiracy entered into

by them in 1916, as set out, and the bill specifically charges:

"Your orators further represent that on or about August 1, 1916, the then officers and directors of said company entered into an unlawful conspiracy to sell the stock of said corporation to the public, including your orators, by means of certain false and fraudulent representations, more particularly hereinafter set forth; that said unlawful conspiracy continued in force and operation from said date until on or about January 1, 1921, and the officers and directors elected after said date of August 1, 1916, joined in and became members of said unlawful conspiracy on or about the dates they were respectively elected as officers and directors of said company; that each and all of the defendant directors were moved to join and become members of said conspiracy and continued to be members thereof, for the purpose and design of preserving their respective investments in the capital stock of said corporation, which had become and were becoming more impaired from time to time by the losses set forth in paragraph 6 of this bill and for the further purpose of participating in the profits and commissions arising from the sale of said stock, and also for the purpose of paying to themselves illegal dividends out of the capital of said corporation."

In fact, in the briefs and arguments it is not contended but that the allegations in the bill are sufficiently specific to charge a conspiracy and fraud, but it is contended that no specific charge of conspiracy and fraud is charged against all of the appellees, but that certain charges are against certain appellees and other charges against other appellees.

The prayer of the bill is that the stock subscriptions of each of the appellants be canceled and decreed to be void and each of the appellants tendered to such of the appellees as may be decreed to be entitled thereto the several stock certificates held by each of them and agree to surrender the same to such appellee or appellees, as the court may direct; and that the ap-

pellants severally have and recover from said appellees the full amount paid by each of them for their respective subscriptions for stock, together with the interest thereon from the date of payment for said stock, deducting therefrom any dividends which may have been paid to the appellants, with interest thereon from date of payment, and that the said appellees and each of them be found to be indebted to each of the appellants in the said respective sums, and that they be decreed to pay the same to each of the appellants by a short day to be fixed by the court, and that in default thereof execution may issue against them and each of said appellees, and there was a prayer for general relief.

The bill contained a list of complainants, the date of the purchase of stock, the respective numbers of shares purchased and the amount paid by each appellant.

Appellees contend that the bill is multifarious; that there is a misjoinder of parties, both defendants and complainants, and that there is no equity stated on the face of the bill, and that courts of equity will not entertain bills of this nature, merely to avoid a multiplicity of suits.

We shall consider these questions in the reverse order from which they are stated.

The jurisdiction of equity, merely to avoid a multiplicity of suits, has been a source of sharp contention between text-writers and courts of last resort for many years. The rule laid down by Pomeroy is quoted in *City of Chicago v. Collins,* 175 Ill. 445, in which the court say (p. 451):

"Where such court is resorted to on the ground of prevention of a multiplicity of suits, there must be a right affecting many persons. (*Poyer v. Village of Des Plaines,* 123 Ill. 111; *Chicago, B. & Q. R. Co. v. City of Ottawa,* 148 Ill. 397.) Pomeroy, in his work on Equity Jurisprudence (sec. 245), in treating of the jurisdiction of courts of equity on that ground, divides

them into four classes, and in the third and fourth classes states the principle: 'Third, where a number of persons have separate and individual claims and rights of action against the same party, A, but all arise from some common cause, are governed by the same legal rule and involve similar facts, and the whole matter might be settled in a single suit brought by all these persons uniting as coplaintiffs, or one of the persons suing on behalf of the others, or even by one person suing for himself alone. The case of several owners of distinct parcels of land upon which the same illegal assessment or tax has been laid is an example of this class. Fourth, where the same party, A, has or claims to have some common right against a number of persons, the establishment of which would regularly require a separate action brought by him against each of these persons or brought by each of them against him, instead thereof he might procure the whole to be determined in one suit brought by himself against all the adverse claimants as codefendants.' "

*City of Chicago v. Collins, supra,* was decided by the court under Pomeroy's rule 3, to enjoin the enforcement of a void city ordinance, where the enforcement of the ordinance, by the city, would affect a great many citizens in a similar manner. It has been further held under this rule that taxpayers of a town, city or county, or other taxing districts, may file a bill to restrain or set aside an illegal general tax, whether personal or made a lien upon their respective properties. (*Allwood v. Cowen,* 111 Ill. 481; *Kimball v. Merchants' Savings, Loan & Trust Co.,* 89 Ill. 611; *Searing v. Heavysides,* 106 Ill. 85.)

Following the doctrine of Pomeroy, under rule 3 as cited, there is a long line of cases where a number of persons, having separate and individual claims and rights of action against the same party, but all arising from some common cause, are governed by the same legal rule and involve similar facts of which equity has taken jurisdiction simply to avoid the multiplicity

of suits at common law. The reason of the rule is tersely stated in *Turner v. City of Mobile*, 135 Ala. 77, 33 So. 132, quoted in *Southern Steel Co. v. Hopkins* [157 Ala. 189], 20 L. R. A. (N. S.) 857. Judge McClellan in that case says:

"So where one party is subjected to or threatened with numerous and vexatious actions at law, or is the victim of numerous, repeated continuing wrongs, so that a multitude of suits would be necessary for his redress at law, he may come into chancery, because the necessity for numerous suits or defenses to numerous suits at law is in itself such a wrong and vexation to him as vests him with an equity."

It was further held in *Southern Steel Co. v. Hopkins, supra* (p. 855):

"The question here, then, is, What is the principle upon which equity interferes to avoid a multiplicity of suits? In determining this, it may be borne in mind that the jurisdiction is not to be invoked when the remedy at law is plain, adequate and complete, and that no court has the right to infringe upon the wholesome doctrine of multifariousness which prevents a mingling of one suit of entirely distinct and separate causes of action between different parties. Subject to these restrictions, the principle and rule is that, where numerous parties are jointly and severally claiming against one, or where one is claiming against many, liable jointly or severally, and the same title or right of defense will be called in question, and will be determinative of the issue for or against all, a case for the interposition of equity to avoid a multiplicity of suits is made without the aid of any independent equity. The fact that this unity of claim or defense frequently or generally arises from privity or joint action by or between the many affords an obvious instance of the application of the rule, and it has induced some to suppose that the junction and unity of interest, calling for the application of the rule, is limited to such cases. But the association and unity of interest in the many as to the other party may be brought about just as well by the nature of the transaction or the situa-

tion and relation of the parties, independent of all privity or joint action. And therefore privity, or joint right or liability, although good examples for the application of the principle, afford no test for the propriety of its application.''

In *Southern Steel Co. v. Hopkins, supra,* appellant procured an injunction against over 100 employees, injured by an accident in the works of appellant, the bill averring that appellant had a complete defense to all suits. The bill was upheld. The same holding was made in *Southern Pac. Co. v. Robinson,* 132 Cal. 408, 64 Pac. 572, 12 L. R. A. (N. S.) 497, where an injunction was issued to restrain over 500 persons, passengers of the road, from bringing individual suits for a penalty, under what was claimed to be a valid ordinance.

However, in *Roanoke Guano Co. v. Saunders,* 173 Ala. 347, 56 So. 198, 35 L. R. A. (N. S.) 491, the appellant, a fertilizer company, was sued by various appellees for injury suffered from the natural and necessary result of the use of acids; that sulphuric fumes and vapors in large quantities were emitted from the factory and that these gases and vapors were noxious and offensive to the inhabitants of the immediate vicinity and were more or less injurious, if not destructive, to vegetable life near the said plant. In this case the Alabama court denied the appellant an injunction, and in specific terms overruled and reversed its former decision in *Southern Steel Co. v. Hopkins, supra,* and explained and modified its language, or a part of it, in *Turner v. City of Mobile, supra.* The court say (35 L. R. A. [N. S.] at page 494) : ''Unfortunately, however, the text announced by Mr. Pomeroy has been followed in a great number of adjudicated cases and probably in the majority of the cases in which the exact proposition has been passed upon,'' and among the cases cited, holding to the Pomeroy rule, the court cites Mississippi cases, *post,* as based upon *Southern Steel Co. v. Hopkins* and other cases, and denominates it as ''a vexed and disputed question.''

In Pomeroy, Eq. Jur. (par. 269, 3rd ed.), page 400, the author states:

"Under the greatest diversity of circumstances, and the greatest variety of claims arising from unauthorized public acts, *private tortious acts,* invasion of property rights, violation of contract obligations, and notwithstanding the positive denials by some American courts, the weight of authority is simply overwhelming that the jurisdiction may and should be exercised, either on behalf of a numerous body of separate claimants against a single party, or on behalf of a single party against such a numerous body, although there is no 'common title' nor 'community of right' or of 'interest in the subject-matter' among these individuals, but where there is and because there is merely a community of interest among them in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body.

"In the majority of decided cases, this community of interest in the questions at issue and in the kind of relief sought has originated from the fact that the separate claims of all the individuals composing the body arose by means of the same unauthorized, unlawful or illegal act or proceeding.

"Even this external feature of unity, however, has not always existed, and is not deemed essential. Courts of the highest standing and ability have repeatedly interfered and exercised this jurisdiction, where the individual claims were not only legally separate, but were separate in time, and each arose from an entirely separate and distinct transaction, simply because there was a community of interest among all the claimants in the question at issue and in the remedy."

But the authority cited by Pomeroy was overruled in *Tribbette v. Illinois Cent. R. Co.,* 70 Miss. 182, 19 L. R. A. 660, which was a case brought to enjoin numerous suits brought against the railroad company for injuries suffered by various plaintiffs from fires,

caused by sparks emitted from engines of defendant company. The learned court dissected all of the cases cited by Pomeroy, and without quoting the facts in the authorities states that in every case there is found a ground for equity, outside of the multiplicity of suits, the writer of the opinion, holding that the doctrine that the mere community of the questions of law and fact authorizes a joinder of complainants in equity is monstrous and states:

"If Pomeroy's test be maintainable, all of these numerous plaintiffs, having a community of interest in the questions of law and fact, claiming because of the same occurrence, depending upon the very same evidence, and seeking the same kind of relief (damages), could be brought before a chancery court in one suit to avoid a multiplicity of suits. But we forbear. Surely the learned author would shrink from the contemplation of such a spectacle, but his doctrine leads to it and makes it possible."

The doctrine stated in Pomeroy was also repudiated in *Illinois Steel Co. v. Schroeder*, 133 Wis. 561, 14 L. R. A. (N. S.) 239, 113 N. W. 51, in which it was held that a combination and conspiracy by defendants claiming title by adverse possession to separate tracts of land, to maintain by corrupt means their several defenses against the plaintiff and the great expense and delay involved in maintaining separate actions of ejectment against them, are not sufficient to give a court of equity jurisdiction of a suit to have plaintiff adjudged the owner of the several tracts and entitled to immediate possession thereof, although the effect of the decision in *Illinois Steel Co. v. Schroeder, supra,* is weakened by a strong dissenting opinion by Justice Marshall and the authority of the *Tribbette* case is later limited to the particular facts involved, inasmuch as the Supreme Court of Mississippi later, in *Blumer v. Ulmer* (Miss.), 44 So. 161, held that equity would take jurisdiction in behalf of different depositors of an insolvent bank to recover from the directors dam-

ages for deceit on the sole ground that a multiplicity of suits was thereby avoided, and in *Whitlock v. Yazoo & M. Val. R. Co.*, 91 Miss. 779, 45 So. 861, it was held that the fact that a number of suits were pending against a railroad company by passengers on the same train to recover damages because of being unreasonably delayed in transit presented sufficient ground for equitable jurisdiction to dispose of such actions in one suit and the several actions at law were restrained. It is to be noticed that the Mississippi court bases its decision in the later cases upon the earlier Alabama cases, which have been overruled by the Alabama court, but Mississippi adheres in these cases to the rule cited by Pomeroy but does not overrule or modify the doctrine in the *Tribbette* case.

A careful examination of the facts in these cases will indicate a reason for applying a different rule to them.

The principle involved was considered in an exhaustive opinion in *Hale v. Allinson*, by the Supreme Court of the United States (188 U. S. 56, 47 L. Ed. 380) and its history traced by numerous cases. There were other questions involved, but the court analyzed the doctrine of equity, based solely upon an avoidance of a multiplicity of suits. It would extend this opinion entirely to too great length to attempt, even in a cursory way, to analyze and review the many English and American cases cited and exhaustively discussed by Mr. Justice Peckham in *Hale v. Allinson*. We shall content ourselves with merely presenting the result of his exhaustive search. He cites sufficiently from the many cases to show how divergent are the decisions on the question of jurisdiction. He states:

"It is easy to say it rests upon the prevention of a multiplicity of suits, but to say whether a particular case comes within the principle is sometimes a much more difficult task. Each case, if not brought directly within the principle of some preceding case, must, as we think, be decided upon its own merits and upon a

survey of the real and substantial convenience of all parties, the adequacy of the legal remedy, the situations of the different parties, the points to be contested and the result which would follow if jurisdiction should be assumed or denied; these various matters being factors to be taken into consideration upon the question of equitable jurisdiction on this ground, and whether within reasonable and fair grounds the suit is calculated to be in truth one which will practically prevent a multiplicity of litigation, and will be an actual convenience to all parties, and will not unreasonably overlook or obstruct the material interests of any. The single fact that a multiplicity of suits may be prevented by this assumption of jurisdiction is not in all cases enough to sustain it. It might be that the exercise of equitable jurisdiction on this ground, while preventing a formal multiplicity of suits, would nevertheless be attended with more and deeper inconvenience to the defendants than would be compensated for by the convenience of a single plaintiff; and where the case is not covered by any controlling precedent the inconvenience might constitute good ground for denying jurisdiction.

"We are not disposed to deny that jurisdiction on the ground of preventing a multiplicity of suits may be exercised in many cases in behalf of a single complainant against a number of defendants, although there is no common title nor community of rights or interest in the subject-matter among such defendants, but where there is a community of interest among them in the questions of law and fact involved in the general controversy."

Jurisdiction was denied in this case on the ground that the defenses of the various multiple defendants who had been purchasers of stock in a corporation might and probably would be various, independent and based upon numerous different grounds. One class living in one State might defend on the ground that their liability, if it ever existed, had expired; others, in other States, upon other grounds based upon the laws of their States; certain defendants might defend

on the ground that they never signed the subscriptions; others that the subscriptions were signed by agents without express or implied authority; and still others that their subscriptions were secured by fraudulent misrepresentations and practices. The court states that the actual dispute can only be known after each defendant has set up his defense and the defenses may vary so widely that no two controversies may be exactly or even nearly alike. "If, as is sure to happen, differing defenses are put in by different defendants, the bill evidently becomes a single proceeding only in name. In reality it is a congeries of suits with little relation to each other, except there is a common plaintiff who has similar claims against many persons. But as each of these persons became liable, if at all, by reason of a contract entered into, by himself alone, with the making of which his codefendants had nothing whatever to do, so he continues to be liable, if at all, because he himself, and not they, has done nothing to discharge the liability."

*Hale v. Allinson, supra,* does hold to the doctrine of the jurisdiction, as laid down by Pomeroy, but it may be conceded that it is not universally adopted. Kentucky has adhered to the rule and quoted the Pomeroy authority in the case of vexatious suits brought by many different persons in *Illinois Cent. R. Co. v. Baker,* 155 Ky. 512, 49 L. R. A. (N. S.) 496. *Rogers v. Boston Club,* 205 Mass. 261, 91 N. E. 321, 28 L. R. A. (N. S.) 743, is a case similar in its facts to *Hale v. Allinson, supra,* and the same result is arrived at. The court say:

"Upon this subject there have been a great many decisions, with considerable conflict among them. The subject is very ably and fully discussed, with a citation of a large number of cases, in 1 Pomeroy on Equity Jurisprudence (3rd ed.), secs. 251-274. It seems now to be settled by a great weight of authority that jurisdiction may sometimes be exercised on behalf of a single party against a numerous body, al-

though there is no common title nor community of right or interest in the subject-matter among those individuals, and where there is and because there is merely a community of interest among them in the questions of law and fact involved in the general controversy or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body.''

That the court of Massachusetts should go so far to indorse the doctrine of Pomeroy as stated, and concede that it was by a great weight of authority, should be given, at least, the same consideration as the authority of the Mississippi court in the *Tribbette* case, holding that there is no such rule and that Pomeroy is not supported by the adjudicated cases.

The New York Court of Appeals in *Mack v. Latta,* 178 N. Y. 525, 67 L. R. A. 126, in a nearly similar case, approved the doctrine of Pomeroy and as to the equitable doctrine said:

''Again, it would more promptly, if not more certainly, restore to the party injured his own, for recovery would necessarily be much delayed by procedure requiring him to exhaust his remedy against the corporation before bringing action against the persons actually guilty of the fraud. It is a favorite object of equity to prevent a multiplicity of suits. And the question presented to a court of equity, when that doctrine is invoked, is 'whether there is a sufficient common bond among the body of similarly situated persons on the one side of the controversy to authorize the court to interfere and give complete relief to them or against them all in one proceeding and thus avoid a multiplicity of suits.' 1 Pomeroy's Eq. Jur., sec. 257, note.

''Under this head Chancellor Kent says, in *Brinkerhoff v. Brown,* 6 Johns. Ch. [N. Y.] 139, 157: 'A bill against several persons must relate to matters of the same nature, and having a connection with each other and in which all the defendants are more or less concerned, though their rights in respect to the general

subject of the case may be distinct.' Pomeroy says (1 Pomeroy's Eq. Jur., sec. 180) :

" 'The fact that there is a legal remedy is not the criterion. That legal remedy, both in respect to its final relief and its mode of obtaining the relief, must be as efficient as the remedy which equity would confer under the same circumstances or else the concurrent jurisdiction attaches.' It must be obvious that the relief afforded by a suit such as plaintiff has brought would be more prompt and, therefore, more efficient, to right the wrong done to a plaintiff by a corporation and its officers and agents, as in this case."

It is to be observed by the statements of the New York court, which is the elementary rule, that plaintiff not only must be shown to have a remedy at law, but it must be an adequate remedy. The basis of the equity to avoid a multiplicity of suits is that a plaintiff does not have an adequate, sufficient or complete remedy at law and the New York court holds that where it is obvious, that the remedy in equity is "more prompt and therefore more efficient, the plaintiff does not have an adequate remedy at law."

This certainly is the rule in a proper case where the equity is based upon a multiplicity of suits. Attention is also called to the language used in *Mack v. Latta, supra:* "Whether there is a sufficient common bond among the body of similarly situated persons on the one side," etc. In the case at bar the "body of similarly situated persons," consists of the numerous complainants, their claims all growing out of contracts for the purchase of stock and the payment of their separate funds into the hands of the corporation and the defendants.

One objection to the jurisdiction raised in *Hale v. Allinson, supra,* and in *Rogers v. Boston Club, supra,* could not be raised in this case. In the case at bar it should be a matter of record the names of the stockholders and the amounts paid by the separate complainants for corporation stock, so that there is a

common bond between all of said complainants, presumptively, and admitted by this record, that all purchased corporation stock and the several amounts were paid therefor, as set out in the bill.

. It is contended by appellees that there is no case in Illinois where the courts have taken jurisdiction on the ground of a multiplicity of suits, except in those cases where the jurisdiction of a court of equity could be grounded upon some other equitable cause, to which the relief to avoid a multiplicity of suits was merely incidental. There are many cases in the books where our courts have taken jurisdiction to avoid a multiplicity of suits, in which other relief was prayed for and other equities adjudicated. In some of these cases it at least would be a mooted question whether the multiplicity of suits was not the basic equity, giving the court jurisdiction, and the other questions involved merely incidental and not sufficient in and of themselves to give a court of equity jurisdiction. .

In *City of Chicago v. Collins,* 175 Ill. 451, three hundred and seventy-three complainants secured an injunction to restrain the city from enforcing an ordinance, providing that all vehicles used upon the streets of the city, including those for private use, for pleasure, etc., should pay an annual license fee, and providing penalties for the violation of the ordinance. The lower court dismissed the bill for want of equity but upon appeal to the Supreme Court the ordinance was held void and the decree of the lower court reversed. Appellees contend that the ground of jurisdiction in this case was the equitable doctrine of injunction. This contention is without basis, because it has been held in numerous cases that the enforcement of an illegal or void ordinance does not confer jurisdiction upon a court of equity to restrain its enforcement. *Wilkie v. City of Chicago,* 188 Ill. 446. Where the rights of the individual only are involved, it is held that he has an adequate remedy at law. In *City of Chicago v. Collins, supra,* the whole subject was dis-

cussed, the doctrine as enunciated by Pomeroy fully quoted, section 245, and the four classes set out in that section referred to and the definition of the third and fourth classes copied and the *Collins* case held to come directly under the third class. There was no equity involved in the bill giving the court jurisdiction, except the equity to avoid a multiplicity of suits. Equity, having taken jurisdiction for the purpose of avoiding a multiplicity of suits, used every arm at its command to protect its jurisdiction and granted an injunction. The court in so many words states the ground of its jurisdiction, "to prevent a multiplicity of suits." It may be, as contended by appellees, "that the doctrine of avoiding a multiplicity of suits first arose in cases involving public right." It is a ground of jurisdiction pertaining to equity courts and in many cases has extended to private rights.

In *German Alliance Ins. Co. v. VanCleave*, 191 Ill. 410, forty-two insurance companies filed a bill against the State superintendent of insurance and the State treasurer to compel said insurance company to refund a tax of two per cent, paid by complainants under protest, etc. There was no equitable question involved in the case, except to avoid a multiplicity of suits, and any one complainant suing would have had an adequate and complete remedy at law. The court held squarely to the Pomeroy doctrine, stating (p. 413):

"It is next insisted that the decree is right because each of the complainants has an adequate remedy at law, by a suit against the insurance superintendent to recover the amount wrongfully collected from it. At least forty-two suits would be necessary to accomplish the purpose and to give to each complainant its legal remedy, and the question involved in each case would be exactly the same. While the demand is separate in each case, the rights of the parties depend upon the same facts. Complete relief may be furnished by a decree determining the single question applicable to all and in which all are interested. The case is a

proper one for an application of equitable powers."

As early as *Imperial Fire Ins. Co. v. Gunning*, 81 Ill. 239, the court announced the general doctrine that: "Commonly, chancery will assume jurisdiction in the first instance to prevent a multiplicity of suits, where a party prosecutes or defends a right against a great number of persons, or where a great number of persons prosecute or defend a right against a single individual."

In *North American Ins. Co. v. Yates*, 214 Ill. 272, the jurisdiction of a court of equity to restrain the violation of a penal statute was directly challenged. Whether or not in the *Yates* case a court of equity could grant an injunction, under the statute, to the superintendent of insurance, the court held as a separate—not incidental—question:

"We are also of the opinion that the bill could be maintained on the ground of avoiding multiplicity of suits. As it is attacked on the ground that it is multifarious, and the consideration of this proposition would, to a degree, involve the other, we will consider whether it is multifarious.

"The general statement of the rule is, if the bill contains several matters of a distinct and independent nature against several defendants it is multifarious, otherwise not. (*Gage v. Parker*, 103 Ill. 528.) To the general rule, it is said, a bill to avoid a multiplicity of suits is an exception. (Story's Eq. Pl., 10th ed., sec. 285.) While the rule above stated is found in law lexicons and text-books, the courts and commentators have almost uniformly held that there is no inflexible rule; that it rests largely in the discretion of the court, and that considerations of convenience to the court, the avoidance of a multiplicity of suits and of unreasonable hardship to the several parties joined are to be taken into account. (*Baird v. Jackson*, 98 Ill. 78; Story's Eq. Pl., sec. 539; *Dunn v. Cooper*, 3 Md. Ch. 46; *Barcus v. Gates*, 89 Fed. 783; *Andrews v. Pratt*, 44 Cal. 309; *German Alliance Ins. Co. v. VanCleave*, 191 Ill. 410.) Although there may be several causes of action, if they grow out of the same transaction and

all the defendants are interested in the same rights, and the relief against each is of the same general character, the bill may be sustained; and where the charge is conspiracy and combination to commit one or many acts, the bill is not multifarious that includes all the conspirators and relates to all the acts within the general scheme. *Brinkerhoff v. Brown,* 6 Johns. Ch. [N. Y.] 139; *Kensington v. White,* 3 Price 164.''

This conclusive holding by the highest court in our State, in cases involving otherwise only legal rights and as a question considered independently of any other ground of equity, is sufficient to render unnecessary further discussion in this case. The ground for equity to avoid a multiplicity of suits may have arisen first in matters of public concern, but by the cases cited in the authorities it is an equity available to all suitors, and we have found it applied to private as well as public affairs. We cannot agree with appellees' contention that to avoid a multiplicity of suits, in a proper case, is not a ground of equity jurisdiction in Illinois.

Nearly the last expression of the court on this subject was in *Abbott v. Loving,* 303 Ill. 154, where the identical question was raised that is insisted upon by appellees in this case, and the court held:

''Among the objections of plaintiffs in error on this point—possibly the one most relied on—is that the bill, as drawn, is multifarious and that, therefore, the demurrer thereto should have been sustained by the trial court. This court has discussed in several cases whether or not a demurrer to a bill in chancery should be sustained on the ground that the bill was multifarious, as here drawn, and the court has said that it is impossible to lay down any rule universally applicable and controlling on this question or to say with certainty what constitutes multifariousness as an abstract proposition under the authorities; that there is no settled and inflexible rule; that the modern tendency of the courts is to relax the rigid rules of pleading and to hold that a bill is not multifarious where causes set forth in the bill may more conveniently be tried in a single suit, where it will avoid a multiplicity of suits.

and where the relief sought in each cause is of the same general character and no unreasonable hardship will be caused the parties against whom the relief is asked. It was held that a bill under such circumstances is not multifarious. (*Anderson v. Anderson,* 293 Ill. 565; *First Nat. Bank of Lincoln v. Starkey,* 268 Ill. 22.) 'A bill is not necessarily rendered multifarious by reason of the fact that there may be united in it several causes of action. If all the different causes of action united in the bill grow out of the same transaction, and if all the defendants are interested in the same rights and the relief against each is of the same general character, the bill may be maintained. No bill is multifarious that presents a common point of litigation, the decision of which will affect the whole subject-matter and will settle the rights of all the parties to the suit.' (10 R. C. L. 430; see, also, on this point, 20 Stand. Encyc. of Procedure 62.)''

On the identical question, this court has in *Smith v. Allemannia Fire Ins. Co. of Pittsburg,* 219 Ill. App. 509, arrived at the same conclusion, but many other questions were involved in that case.

It remains to consider whether there is a misjoinder of defendants and whether all of the defendants, appellees, in the bill are liable to all the complainants. The bill charges a conspiracy, a plan, a design, entered into by the officers and directors of said company, on or about the 1st day of August, 1916; that certain fraudulent acts were perpetrated by said officers and directors, in pursuance of said conspiracy and design. It is further charged that this fraudulent design and conspiracy continued until January 1, 1921, and that the officers and directors elected after August 1, 1916, joined and entered into said conspiracy and fraudulent design. The purpose to defraud is stated, the common design and motive and the specific acts of fraud, by which the corrupt plan was carried out, is fully set out. These charges are admitted to be true by the demurrer, and appellees, in their brief and argument, make no contention but that the

charges are sufficient in form to constitute a charge of conspiracy. While the design and plan were being carried out, after overt acts had been committed, some of the conspirators dropped.out and others were taken in. Under the allegations in the bill there was only one general, common scheme, plan and conspiracy carried out. The demurrer for the purposes of this hearing admits that to be true. In this state of the record all of the defendants, appellees, and all participating in the common plan and conspiracy, are equally liable to appellants as a single, collective body or a single person as described by Pomeroy in his quoted rule 3.

It has been held in numerous cases that:

"It is not necessary to prove that the conspiracy originated with any part or all of the co-conspirators, or that they met during the process of its concoction, because every person entering into a conspiracy or common design already formed is deemed, in law, a party to all acts done by any of the parties before or afterwards, in furtherance of the common design." (*People v. Lloyd,* 304 Ill. 23; *Ochs v. People,* 124 Ill. 399; *Cooke v. People,* 231 Ill. 9; *People v. Strauch,* 240 Ill. 60; 3 Greenleaf on Evidence, sec. 92; *Purington v. Hinchliff,* 219 Ill. 159; *Doremus v. Hennessy,* 176 Ill. 614; *Franklin Union v. People,* 220 Ill. 377; 12 Corpus Juris 612, note 49; *Aughey v. Windrem,* 137 Iowa 315, 114 N. W. 1047; *Wolfgram v. Dill,* 37 S. D. 282, 157 N. W. 1059.)

This principle of law seems to be so elementary that we do not extend this opinion to quote further from any cases.

Counsel for appellants cite cases holding that it is the law that directors of a corporation are presumed to know its financial condition, but such cases, grounding a charge of negligence, are not applicable in this case, where the issue is fraud and conspiracy.

There is a very sharp contention in this case as to whether the allegations of fraud, the purchase and issuing of the stock, the rescission of such purchase, and appellants' offer to restore such certificates to the re-

spective appellees constitute an independent ground of equity.

Appellants, relying upon such cases as *Shenehon v. Illinois Life Ins. Co.*, 100 Ill. App. 281; *Des Moines Life Ins. Co. v. Seifert*, 112 Ill. App. 277; *Shorman v. Hurd*, 107 Ill. App. 471; *Jack v. Blettner*, 148 Ill. App. 451, and *Hartford Fire Ins. Co. v. Ledford*, 151 Ill. App. 416, insist that the allegations in the bill on the subject of fraud do not state a case subject to equitable cognizance, but that the complainants, in that respect, have an adequate remedy at law. Appellants cite *Grand Tower & C. G. R. Co. v. Walton*, 150 Ill. 428; *Wright v. McKinney*, 287 Ill. 529; *Abbott v. Loving*, 303 Ill. 154, and *Fred Macey Co. v. Macey*, 143 Mich. 138, 5 L. R. A. (N. S.) 1037, and other cases as predicating an independent ground of equity, based upon the averments of fraud as set out in the bill. It is alleged that the corporation is insolvent and that its affairs have been taken over by a court in bankruptcy. From the allegations of the bill, set out in the abstract, we have not been able to determine whether there may be dividends upon the assets, to be distributed to the shareholders, or whether the shares of stock, in the hands of appellees, might or might not be subject to any liability, and we have not examined the cases presented with sufficient care to arrive at a conclusion whether the allegations in the bill state a case independently, on the ground of fraud, cognizable in a court of equity. If the certificates of shares of stock in the hands of appellants represented any value or right to dividends or charged the holder with any liability as between the parties to this suit, we should be inclined to hold that appellants, on the facts set forth in this bill, would be entitled to the aid of a court of equity to rescind the purchase and restore the certificates to their proper owner. But in the opinion of this court, the bill states a ground for equity to avoid a multiplicity of suits, and equity, having taken jurisdiction for one purpose, will afford complete relief for

all purposes.   Under the allegations of the bill, the appellees constitute the one party to the bill; they are several in number, but charged with having organized a conspiracy or concerted plan to wrong and defraud the said corporation and the appellants.   The appellees are not charged with frauds severally or individually, but are charged with a conspiracy and agreement to work together and in concert to accomplish a fraud. These allegations for the purpose of this hearing are admitted to be true, and it follows that the act of each becomes the act of all, as well those who entered into the conspiracy in 1916 and some time later ceased their operations, as those who did not become connected with the conspiracy until a later date.   There are a large number of complainants, some owning only one share of stock, others two shares, and the shares of stock generally held by the appellants are few in numbers and comparatively of small amount in value. The greater in number of the appellants each owns ten shares or less.   To remit these appellants with their numerous cases, individually, to a court of law to combat the appellees, in the face of the conspiracy charged, is to deny them, substantially, a trial of any kind.   Under the allegations of the bill, appellants all purchased stock upon the series of fraud, deceit and misrepresentations made by the appellees, acting in concert and in unison from an organized plan, to which all had agreed.   It is the opinion of this court that the facts charged constitute a ground for equitable interference, and that the demurrer to the bill of complaint interposed by the appellees should be overruled and the appellees be required to answer the bill.

The judgment of the McLean county circuit court is reversed and the cause remanded with directions to overrule the demurrer to the bill of complaint and require appellees to answer the bill.

*Reversed and remanded with directions.*